IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    PLAINTIFF,<br><br>v.<br><br>ROGER S. BLISS, et al.<br><br>    DEFENDANTS. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:15-cv-00098-RJS<br><br>Judge: Robert J. Shelby |

      The Securities and Exchange Commission brings this enforcement action alleging Defendant Roger S. Bliss violated the securities laws by running a Ponzi scheme related to a so-called investment club in which he used investor money to trade stock.  The Commission alleges that Mr. Bliss made numerous misrepresentations and that, as a result, investors have lost millions of dollars.

      The issue before the court is whether Mr. Bliss should be held in civil contempt for failure to comply with court orders freezing his assets and appointing a receiver to locate, take control of, and preserve all of his assets.  For the reasons stated below, the court holds Mr. Bliss in contempt, stays imposition of civil-contempt remedies, and refers the matter to the United States Attorney's Office for the District of Utah for screening to consider whether to prosecute Mr. Bliss for criminal contempt, and whether to prosecute Mr. Bliss and Kevin Fortney for perjury.

## PROCEDURAL HISTORY

### I. The Court Orders

The Securities and Exchange Commission brought this enforcement action against Mr. Bliss in February 2015.[1] The court entered a temporary restraining order on February 11, 2015[2] and a preliminary injunction on March 31, 2015.[3] Both orders enjoined Mr. Bliss from engaging in the conduct described in the Commission's Complaint, including trading stocks.

The court also issued an Asset Freeze Order on February 11, 2015, granting the court "exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of [Mr. Bliss and his related entities]."[4] The court enjoined anyone in control of Mr. Bliss's assets from disposing of the assets.[5] On June 10, 2015, the court issued the Order Appointing Receiver, appointing Tammy Georgelas as the Receiver, reaffirming the asset freeze, and requiring Mr. Bliss to disclose "the identity, location and estimated value of all Receivership Property."[6] Mr. Bliss concedes that he had actual notice at all relevant times of the Asset Freeze Order and the Order Appointing Receiver.

### II. The First Motion for Order to Show Cause

In early June 2015, the Commission filed its first Motion for Order to Show Cause, urging the court to hold Mr. Bliss in civil contempt.[7] The Commission alleged that it had discovered that Mr. Bliss was day trading stock in violation of the court's preliminary injunction.

---

[1] Dkt. 1.
[2] Dkt. 8.
[3] Dkt. 32.
[4] Dkt. 9.
[5] *Id.*
[6] Dkt. 39.
[7] Dkt. 37.

On July 17, 2015, the court entered a stipulated order enjoining Mr. Bliss from trading stock, soliciting investors, and teaching others how to trade stock.[8]

### III. The Second Motion for Order to Show Cause

The Commission filed a second Motion for Order to Show Cause on July 23, 2015.[9] The Commission contends that Mr. Bliss violated the court's Asset Freeze Order and Order Appointing Receiver by failing to disclose his interest in a catamaran sailboat, two other sailboats docked at Utah Lake (the Ranger 22 and the Hobie), a Macintosh computer, two swinging chairs, and a new washer and dryer.

After the parties fully briefed the matter and submitted evidence, it became clear that any finding of contempt would hinge on the events surrounding the Utah Lake boats and the catamaran. When the Commission initially filed its Motion, it submitted declarations from Jordan Parry, Ron Willie, and Todd Frye. Mr. Parry's declaration stated that he witnessed Mr. Bliss remove a catamaran sailboat from Mr. Bliss's former property near Bear Lake (a lake located on the Utah-Idaho border) on February 16, 2015, five days after the court entered the Asset Freeze Order. Mr. Bliss had not disclosed the catamaran to the Commission or the Receiver. Mr. Willie's declaration stated that Mr. Bliss owned a sailboat called the Ranger 22 that was located at Utah Lake and that Mr. Bliss attempted to donate the Ranger 22 to Mr. Willie's sailing school sometime in June 2015. The Commission also referenced in its Motion the Receiver's Notice of Apparent Failure of Roger S. Bliss to Comply with Court Order,[10] which stated that Mr. Bliss owned another sailboat at Utah Lake called the Hobie. Like the catamaran, Mr. Bliss did not disclose the Ranger 22 or the Hobie.

---

[8] Dkt. 63.
[9] Dkt. 69.
[10] Dkt. 57.

In response to the Commission's Motion, Mr. Bliss submitted a declaration stating that his brother-in-law, Mr. Fortney, owned the catamaran.[11] Mr. Fortney also submitted a declaration stating that he owned the catamaran and moved it to his home in St. George, Utah in "early February." Mr. Bliss further declared that he attempted to donate the Ranger 22 and the Hobie to the Bonneville School of Sailing at some point before July 2014, months before the Commission filed its lawsuit. Mr. Bliss contended in his response that he was clearly in compliance with the court orders. He urged the court to award attorney's fees to his counsel, arguing that the matter could easily have been resolved if the Commission had simply contacted Mr. Bliss's counsel to discuss the matter.

The Commission then submitted a reply memorandum and supporting evidence that more fully revealed the events relevant to the catamaran.[12] The Commission submitted emails, declarations, and documentary evidence that refuted and called into question the truthfulness of any claim that Mr. Fortney owned the catamaran. The evidence showed Mr. Bliss purchased the boat for himself and coordinated with Mr. Fortney to remove the boat from the Bear Lake property only days after entry of the court's Asset Freeze Order.

The court held the show-cause hearing on August 7, 2015, in which it received testimony from a number of witnesses and heard argument from Mr. Bliss's counsel, the Commission, and the Receiver.[13] The Commission presented persuasive and credible evidence that Mr. Bliss purchased the catamaran and acted in concert with Mr. Fortney to move and dispose of the boat. When Mr. Bliss testified, he invoked his Fifth Amendment right and refused to answer the Commission's questions, including questions concerning the truthfulness of his statements in his declaration regarding the catamaran.

---

[11] Dkt. 77.
[12] Dkt. 80.
[13] Dkt. 81.

**FINDINGS OF FACT**

The court makes the following findings based on the testimony and evidence received by the court, including the opportunity to assess the credibility of the witnesses who testified during the show-cause hearing.

### A. The Utah Lake Boats

Mr. Bliss failed to disclose the Hobie and Ranger 22 sailboats that he owned and kept at Utah Lake. In his declaration, Mr. Bliss stated that he previously owned the boats, but did not disclose them because he believed that he had successfully donated them to the Bonneville School of Sailing at some point before July 2014. Mr. Bliss submitted no corroboration of this testimony. He provided no documentation of any kind evidencing his claimed donation. Neither did he submit testimony from any witness confirming his donation. To the contrary, Mr. Bliss invoked his Fifth Amendment privilege in response to questions at the show-cause hearing about his declaration testimony relating to the Utah Lake sailboats. And the Commission submitted credible, competent evidence soundly refuting Mr. Bliss's claim.

#### 1. The Ranger 22

Todd Frye, the director of the Bonneville School of Sailing, testified that he spoke with Mr. Bliss multiple times over the course of several years about the possibility of Mr. Bliss donating the Ranger 22 to the school. Mr. Frye never accepted the proposal. Nor were there ever any "definitive plans" for the school to use the boat. To the contrary, Mr. Frye testified that "a big deterrent" to the school accepting the Ranger 22 was that it was difficult to sail the large-sized boat on the shallow Utah Lake. Mr. Frye also testified that he spoke with Mr. Bliss within the previous two months prior to the hearing—well after the court issued the Asset Freeze Order and well after the timeframe in which Mr. Bliss claimed to have donated the boat—and that Mr.

Bliss asked during that conversation if he could donate or lease the Ranger 22 to the sailing school. Mr. Frye declined the offer. He testified that the Ranger 22 still belongs to Mr. Bliss and is currently located in dry storage at Utah Lake.

The court finds that Mr. Bliss was aware as recently as two months ago that he still owned the Ranger 22 but failed to disclose the boat to the Receiver and attempted to secretly dispose of it by asking if he could donate or lease the boat to the Bonneville School of Sailing.

### 2. The Hobie

The Hobie was recently impounded due to unpaid storage fees. The impound fee was $40 per day. By the time the Receiver discovered the Hobie, the impound fees exceeded the value of the boat. Because the Receiver could not sell the boat for a profit, she abandoned it and transferred title to the impound company. The Receiver testified that she could have taken control of the Hobie and possibly recovered some value from it if Mr. Bliss had timely disclosed it pursuant to the Order Appointing Receiver.

Mr. Bliss stated in his declaration that he believed he had donated the Hobie, along with the Ranger 22, to the Bonneville School of Sailing. But the school never accepted a donation from Mr. Bliss. When Mr. Bliss testified at the show-cause hearing, the Commission asked, "In paragraph six [of your declaration], you state, 'Over a year ago, I attempted to, and believed I had donated, two older sailboats, a 1977 Ranger 22 and a 1989 Hobie, to the Bonneville Sailing School.' Is that a true and accurate statement?" In response, Mr. Bliss invoked his Fifth Amendment rights and refused to answer the question. The court draws an adverse inference against Mr. Bliss.[14] Based on the adverse inference and the Commission's evidence, including

---

[14] *Cf. Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (reaffirming "the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them").

6

Mr. Frye's credible testimony, the court finds that Mr. Bliss did not donate the Hobie to the Bonneville School of Sailing and failed to disclose the asset.

### B. The Catamaran

Mr. Bliss failed to disclose that he owned a 2014 NACRA 17 catamaran sailboat located at his former property near Bear Lake. Mr. Bliss stated in his declaration that Mr. Fortney owned the catamaran but kept it at Mr. Bliss's Bear Lake property. Mr. Fortney likewise stated in his declaration that he owned the boat, and that he often visited Bear Lake and used the catamaran. The Commission submitted ample evidence to not only refute the declarations, but to also call into question Mr. Bliss's and Mr. Fortney's forthrightness with the court.

Mr. Bliss purchased the catamaran in 2014 from Brett Bingham, a boat dealer for Icarus Sports USA. Icarus Sports USA sells boats manufactured by NACRA and distributed by KPC Distributions. Mr. Bingham testified that Mr. Bliss initially contacted Icarus Sports USA to inquire about purchasing a NACRA 17 catamaran, a high performance sailboat typically used by athletes training for the Olympics.

Over the next several months, Mr. Bingham communicated with Mr. Bliss approximately ten times through both phone calls and emails. Mr. Bliss eventually purchased a NACRA 17 catamaran from Mr. Bingham. Mr. Bliss was the only person who communicated with Mr. Bingham about the boat, and Mr. Bliss never mentioned that he was purchasing the boat for or on behalf of anyone else. Mr. Bliss selected and ordered accessories for the boat and made decisions about specific details, like the color of certain parts. His name appeared on the NACRA 17 Dealer Order Form. Mr. Bingham addressed his emails to Mr. Bliss and inquired about Mr. Bliss's preferences regarding certain boat accessories. One email from Mr. Bingham to Mr. Bliss states, "Hi Roger, Attached is the copy of the purchase order and the check you gave

me." The attachment is a check dated June 24, 2014 for $31,117 that appears to be signed by Mr. Bliss. The check bears Mr. Bliss's name and address, and was drawn on a Wells Fargo bank account in Mr. Bliss's name. Mr. Bingham had no reason to believe that someone other than Mr. Bliss was purchasing the boat for Mr. Fortney.

Mr. Bingham delivered the catamaran to Mr. Bliss at Bear Lake around July 4, 2014. Mr. Bingham testified that he spent time the day he delivered the catamaran training Mr. Bliss on its operation and use. Around September 2014, Mr. Bingham delivered a catamaran trailer to Mr. Bliss at the Bear Lake home. Mr. Bliss did not pay for the trailer at the time.

Ron Willie has a home near Mr. Bliss's former home at Bear Lake. Mr. Willie visits his Bear Lake home nearly every weekend. He testified that he saw Mr. Bliss sailing the catamaran during the July 4th weekend of 2014. After that weekend, the catamaran stayed on the lake shore for the rest of the summer. Mr. Willie did not see anyone else sail the boat that summer.

On February 16, 2015, five days after the court issued the Asset Freeze Order, Jordan Parry saw Mr. Bliss remove the catamaran from the Bear Lake property. Mr. Bliss was with his wife and two people that Mr. Parry did not recognize. Mr. Fortney stated in his declaration that in "early 2015," he "coordinated with Roger Bliss to take the boat" and that he hauled the boat to St. George, Utah. At the time Mr. Bliss moved the boat, Mr. Parry's construction company was building a garage for Mr. Bliss near the Bear Lake home. Mr. Parry was aware of the Commission's lawsuit and called Mr. Bliss that same day to "confront him" about the debt he owed Mr. Parry's company. During that conversation, Mr. Bliss stated that he needed to sell the boat in order to "make ends meet."

Around that same time period, in early February, Mr. Fortney contacted Mr. Bingham. Mr. Fortney informed Mr. Bingham that he was in possession of the NACRA catamaran in St.

George, Utah and that he would be handling the financial matters related to the boat. Mr. Bingham called Mr. Bliss to confirm the accuracy of Mr. Fortney's statements and Mr. Bliss did so. Mr. Bliss also told Mr. Bingham that Mr. Fortney would pay for the catamaran trailer that Mr. Bingham had delivered to Mr. Bliss at Bear Lake. Mr. Fortney contacted Mr. Bingham again in mid-February seeking a bill of sale for the catamaran. At Mr. Fortney's request, Mr. Bingham created a bill of sale in March 2015 falsely stating that NACRA (the manufacturer) sold the catamaran directly to Mr. Fortney. The document—which Mr. Bingham created in March 2015—was dated July 15, 2014. Mr. Bingham testified that the handwritten date on the bill of sale was not in his handwriting. Mr. Fortney told Mr. Bingham that, if anyone were to inquire, Mr. Bingham should tell them that Mr. Fortney purchased the boat. Within the two weeks before the hearing, Mr. Fortney paid Mr. Bingham $2,200 for the catamaran trailer that Mr. Bingham had previously delivered to Mr. Bliss at Bear Lake.

On July 15, 2015, Mr. Fortney sold the catamaran to Arizona resident Brett Johnston. Mr. Johnston saw the boat listed on Craigslist in early July 2015. Mr. Johnston's declaration states, "The sailboat and custom trailer were listed for sale for $13,900 by a seller named Kevin Fortney in St. George, Utah." Mr. Fortney told Mr. Johnston that he had repossessed the boat from a debtor who owed him "six figures." Mr. Johnston purchased the boat for $12,800. Mr. Fortney provided Mr. Johnston with a bill of sale dated July 15, 2015, along with the inaccurate bill of sale that falsely reflected Mr. Fortney's purchase of the catamaran from NACRA a year earlier, on July 15, 2014.

The timing and sequence of the evidentiary submissions by the parties and related events is significant to the court's findings. On July 23, 2015, the Commission filed its second Motion for Order to Show Cause, arguing that Mr. Bliss had concealed and moved the catamaran within

9

days of the court entering its Asset Freeze Order.[15] The court imposed an accelerated briefing schedule and set a show-cause hearing for August 7.[16] The Commission attached to its Motion declarations from Mr. Parry and Mr. Willie stating that Mr. Bliss moved the catamaran from the Bear Lake home. Mr. Bliss responded to the Commission's Motion on July 31.[17] Attached to the response memorandum were Mr. Bliss's and Mr. Fortney's declarations stating that Mr. Fortney owned the catamaran. In his declaration, Mr. Bliss stated, "At no time did I have any ownership interest in the catamaran that Kevin Fortney stored at Bear Lake." Notably, neither Mr. Bliss nor Mr. Fortney submitted any documentary evidence supporting their conclusory statements concerning Mr. Fortney's claimed ownership. Neither submitted copies of a title for the boat, tax records reflecting ownership, copies of invoices or payment records relating to Mr. Fortney's claimed purchase, or any other usual and customary records generally associated with the purchase or ownership of an asset valued at over $30,000.

On August 5, the Commission filed its reply memorandum and attached evidence that provided a more complete picture of Mr. Bliss's and Mr. Fortney's conduct.[18] Aided by an FBI special agent's forensic examination of Mr. Bliss's computer images and email correspondence, the Commission obtained and submitted with its reply memorandum emails between Mr. Bliss and Mr. Bingham showing that Mr. Bliss purchased the catamaran. The Commission also provided a declaration from Kurt Korte of KPC Distributions describing the questionable authenticity of the July 15, 2014 bill of sale, and a declaration from Mr. Johnston describing his purchase of the catamaran from Mr. Fortney. Mr. Bliss has offered no response to the evidence that the Commission submitted with its reply memorandum, except to invoke his Fifth

---

[15] Dkt. 69.
[16] Dkt. 70.
[17] Dkt. 77.
[18] Dkt. 80.

Amendment right against self-incrimination when called to testify at the show-cause hearing. Neither Mr. Bliss nor Mr. Fortney have challenged or attempted to rebut the Commission's evidence. The day after the Commission submitted its reply memorandum and evidence, Mr. Fortney contacted Mr. Johnston seeking to buy back the catamaran so that he could deliver it to the Receiver.

The Commission called Mr. Bliss to testify at the show-cause hearing. Among other topics, the Commission asked Mr. Bliss questions about his purchase and ownership of the catamaran, as well as direct questions concerning the truthfulness of statements Mr. Bliss made in his declaration. Mr. Bliss invoked his Fifth Amendment right in response to every question and refused to provide any answers. The court draws an adverse inference from Mr. Bliss's refusal to testify, especially concerning matters set forth in the declaration he submitted to the court only days earlier.

After considering the relevant evidence, the court finds that Mr. Bliss purchased the catamaran in June 2014 for himself, and not for Mr. Fortney. The court also finds that Mr. Bliss concealed the asset and falsely represented that Mr. Fortney owned the boat. Further, the court finds that Mr. Fortney falsely stated that he owned the boat, prevailed on Mr. Bingham to create a false and inaccurate bill of sale, and disposed of the asset by selling it to Mr. Johnston.

## CONCLUSIONS OF LAW

### I. Contempt Standard

It is well established that federal courts have the power to punish contemnors. Congress provided a statutory basis to do so in 18 U.S.C. § 401:

> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—
>
> . . . .
>
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

In a civil-contempt proceeding, "the plaintiff has the burden of proving, by clear and convincing evidence, that a valid court order existed, that the defendant had knowledge of the order, and that the defendant disobeyed the order."[19] If the plaintiff succeeds, the burden shifts to the defendant to show "either that he had complied with the order or that he could not comply with it."[20]

### II. Mr. Bliss Is in Contempt of the Court's Asset Freeze Order and the Order Appointing Receiver

#### A. The Commission Made an Initial Showing of Contempt

Mr. Bliss violated the court's Asset Freeze Order and the Order Appointing Receiver. It is undisputed that both are valid orders issued by the court, and that Mr. Bliss had knowledge of them. Moreover, the Commission has shown by clear and convincing evidence that Mr. Bliss disobeyed the orders. First, the documentary evidence and witness testimony persuasively establish that Mr. Bliss purchased the NACRA 17 catamaran for himself. The record contains several emails between Mr. Bliss and Mr. Bingham that show Mr. Bliss ordered the boat, selected the specifications, and paid for the boat with a check bearing his name and address, and drawn on his Wells Fargo bank account. Additionally, Mr. Bingham delivered the catamaran

---

[19] *Reliance Ins. Co. v. Mast Const. Co.*, 159 F.3d 1311, 1315 (10th Cir. 1998).
[20] *United States v. Ford*, 514 F.3d 1047, 1051 (10th Cir. 2008).

and the custom trailer to Mr. Bliss at Bear Lake. Mr. Bliss did not tell Mr. Bingham that he was purchasing the boat for or on behalf of Mr. Fortney. And he did not suggest any changes to the Dealer Order Form containing his name or clarify that Mr. Fortney was purchasing the boat in response to Mr. Bingham's emails.

Second, Mr. Bliss has failed to submit any credible or persuasive evidence showing that Mr. Fortney owned the boat. Mr. Bliss's counsel attempted to muddy the waters at the show-cause hearing by presenting evidence that the check was drawn on the same Wells Fargo bank account in which Mr. Bliss deposited investor funds. According to Mr. Bliss's disclosures, Mr. Fortney invested nearly $600,000 in Mr. Bliss's "investment club." The theory, it seems, is that Mr. Bliss used part of Mr. Fortney's investment to purchase the boat on Mr. Fortney's behalf, which would explain why the check was written out of the Wells Fargo account in which Mr. Fortney's investment was deposited. But the mere fact that Mr. Bliss wrote a check drawn on the bank account in which he had deposited Mr. Fortney's investment does not support a finding that Mr. Fortney purchased the boat any more than it supports a finding that a score of other investors whose funds were deposited in the same account purchased the boat. What's more, Mr. Fortney's various statements about the boat are inconsistent and reveal an attempt to conceal and mislead. He told Mr. Bingham that he took the boat and planned to sell it because Mr. Bliss was in financial trouble. He subsequently asked Mr. Bingham to create a false bill of sale and directed him to tell any who might inquire that Mr. Bliss did not own the boat. He later told Mr. Johnston that he had repossessed the boat from a debtor. And there is no documentary evidence to support Mr. Fortney's claim to ownership. At bottom, there is no persuasive evidence that Mr. Fortney actually owned the boat. In fact, the evidence supports a finding that Mr. Bliss owned

the boat and that he and Mr. Fortney engaged in deliberately misleading conduct to in an effort to conceal the catamaran and secretly sell it.

Third, Mr. Bliss did not disclose the catamaran or the Utah Lake sailboats. Pursuant to the Order Appointing Receiver, Mr. Bliss submitted two separate declarations, along with lists of his assets. Neither submission listed the catamaran or the Utah Lake sailboats. The Receiver independently discovered the assets. The Receiver discovered the Hobie after the accrued impound fees had grown to exceed the value of the boat. Mr. Bliss's failure to disclose the asset caused the Receiver to incur unnecessary costs and expenses to pursue an asset that the Receiver eventually had to abandon. Further, the Receiver continues to expend additional time and resources to secure the Ranger 22 and the catamaran. These costs could have been avoided if Mr. Bliss had timely and fully disclosed his assets. Proper disclosure would have resulted in additional assets in the receivership estate that could have eventually been used to reimburse investors. Mr. Bliss's concealment has instead compounded investors' losses. It also violated the court orders.

Fourth, Mr. Bliss attempted to dispose of the Ranger 22. Less than two months before the show-cause hearing, he sought to donate or lease the boat to the Bonneville School of Sailing. Mr. Bliss claims that he believed he had donated the boat to the school sometime before July 2014. But the record evidence shows that the school never accepted or made plans to accept a donation. Mr. Bliss was aware that he owned the boat and attempted to dispose of it around June or July 2015. Even assuming Mr. Bliss sincerely believed he had donated the Ranger 22, the correct course after discovering that he still owned it would be to promptly disclose it to the Receiver. Instead, Mr. Bliss attempted to dispose of it.

Fifth, Mr. Bliss disposed of the catamaran. There is no evidence that Mr. Bliss directly participated in the sale of the boat to Mr. Johnston or received any of the sale proceeds. However, there is sufficient evidence that Mr. Bliss coordinated with Mr. Fortney (his brother-in-law) to move the catamaran from the Bear Lake property to St. George. That conduct, by itself, violated the court orders. It does not stop there, however. Mr. Bliss told Mr. Bingham that Mr. Fortney was authorized to control the boat. This provided Mr. Bingham the assurance he needed to create a false, back-dated bill of sale for Mr. Fortney. And the bill of sale gave Mr. Fortney the ability to sell the boat. All the while, Mr. Bliss represented to the court in a declaration that Mr. Fortney owned the boat. Yet, when the Commission asked Mr. Bliss to confirm the truthfulness of the declaration, Mr. Bliss invoked his Fifth Amendment rights.

The court concludes that the Commission has made an adequate showing that Mr. Bliss violated the Asset Freeze Order and the Order Appointing Receiver.

### B. Mr. Bliss Failed to Show that He Complied or Could not Comply with the Court Orders

The Commission satisfied its initial burden of showing that there were valid court orders, that Mr. Bliss was aware of the orders, and that Mr. Bliss violated the orders. The burden now shifts back to Mr. Bliss to show "either that he had complied with the order[s] or that he could not comply with [them]."[21] As stated, there is no credible or persuasive evidence that Mr. Fortney purchased or owned the catamaran. And there is no evidence that Mr. Bliss disclosed the catamaran, the Hobie, or the Ranger 22. In other words, Mr. Bliss has failed to prove that he complied with the court orders.

The question thus becomes whether Mr. Bliss has shown that he could not comply with the orders. At the show-cause hearing, Mr. Bliss's counsel argued that the impossibility defense

---

[21] *United States v. Ford*, 514 F.3d 1047, 1051 (10th Cir. 2008).

applies to the catamaran.  In other words, he argued that Mr. Bliss could not comply with the orders because the boat is now in the hands of a third party that Mr. Bliss does not control. Counsel also argued that Mr. Bliss is in compliance with the orders as it pertains to the Utah Lake sailboats because the Receiver abandoned the Hobie and the Ranger 22 is available for the Receiver to take title.

These arguments conflate the contempt elements with the contempt remedies.  Although pertinent to the discussion below regarding remedies, these arguments are neither relevant nor persuasive on the question whether Mr. Bliss was able to comply with the Asset Freeze Order and Order Appointing Receiver at the time of the purported violations.  There is no evidence that Mr. Bliss was in any way prevented from disclosing the Hobie, the Ranger 22, or the catamaran. And there is certainly no evidence that Mr. Bliss was unable to refrain from disposing of the catamaran or attempting to dispose of the Ranger 22.  The fact that Mr. Bliss made it impossible to cure his contempt at this point—by concealing the Hobie until it was valueless, making the undisclosed Ranger 22 available only after the Receiver discovered it, and secretly transferring the catamaran to others out of his control—does not save him from a finding of contempt.  If that were so, a party could avoid contempt by successfully dissipating assets or by simply disclosing hidden assets after they are already discovered.

The court concludes that Mr. Bliss has failed to show that he complied or could not comply with the court orders.  Thus, the court finds that Mr. Bliss is in contempt of the court's Asset Freeze Order and Order Appointing Receiver.

### III. Contempt Remedies

Civil contempt sanctions are appropriate to "compensate parties for losses resulting from the contemnor's non-compliance with a court order" and "to compel or coerce obedience of a court order."[22] Compensatory remedies are inappropriate in this instance. There are at least two parties that Mr. Bliss's contempt has negatively affected. First, Mr. Bliss has caused the Commission to incur the costs and expenses of prosecuting contempt for the second time. However, any attorney's fees and costs paid to the Commission will come out of the receivership estate, meaning less money will be available to pay back investors. Second, Mr. Bliss has harmed the investors. Mr. Bliss's concealment of assets has caused the Receiver to incur additional costs and expenses that will ultimately be paid out of the receivership estate. But because Mr. Bliss effectively has no assets, and all his former assets are part of the estate, it would be futile to order Mr. Bliss to pay a fine to recuperate estate losses. The court therefore declines to impose compensatory sanctions.

The court also has discretion to impose coercive sanctions. Coercive sanctions are designed to bring the contemnor into compliance with the court's order. They are "avoidable through obedience."[23] In other words, "the contemnor is afforded an opportunity to purge" himself through compliance with the court order.[24] Here, Mr. Bliss is incapable of purging himself of his contempt because he is no longer in control of the three boats at issue. The Receiver has abandoned the Hobie and can seize the Ranger 22 at any time. The catamaran is in possession of Mr. Johnston in Phoenix, Arizona. Mr. Bliss has no control over Mr. Johnston and cannot compel him to transfer possession or title to the Receiver. Because Mr. Bliss cannot come into compliance through his own power, imprisonment could be viewed on these facts as

---

[22] *In re Skinner*, 917 F.2d 444, 447 n.2 (10th Cir. 1990).
[23] *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994).
[24] *Id.* at 829.

punitive.[25]  The court thus finds it appropriate to stay the imposition of civil-contempt sanctions. Having concluded that monetary contempt sanctions are ill suited in this context, the court holds open the possibility that incarceration may be necessary and appropriate in the event of further contempt—not as a punitive sanction, but to obtain Mr. Bliss's compliance with the court's orders going forward.

## IV.  Referral to the United States Attorney's Office

None of this is to say that the court is not deeply troubled by Mr. Bliss's willful and repeated disregard of the court orders.  "If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery."[26]  Mr. Bliss's repeated violations of the court orders do violence to the rule of law and attempt to undermine the court's authority.

Such conduct also obstructs the efficiency of this lawsuit by causing the parties and the court to expend time and resources on matters separate from the merits of the Commission's claims and the efficient administration of the receivership estate.  Ultimately, these contempt proceedings have diminished the receivership estate and further delayed the recovery and disposition of the receivership assets.  The losses and delays harm investors—the very people that Mr. Bliss has allegedly victimized already.

With all of this in view, the court refers the matter to the United States Attorney for the District of Utah for screening to consider whether to prosecute Mr. Bliss for criminal contempt.

---

[25] A federal district court in the Western District of North Carolina addressed a similar circumstance.  *See U.S. Commodity Futures Trading Comm'n v. Capitalstreet Fin., LLC*, No. 3:09CV387-RJC-DCK, 2010 WL 2131852, at *3 (W.D.N.C. May 25, 2010).  In that case, the assets at issue were no longer in control of the contemnor, meaning the contemnor could not purge his contempt by delivering the assets to the receiver.  *Id.*  The court concluded that imprisonment would be punitive in that scenario and referred the matter to the United States Attorney's Office.  *Id.*
[26] *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911).

As outlined above, Mr. Bliss is in contempt of the court's Asset Freeze Order and Order Appointing Receiver. He failed to disclose that the owned the Hobie, the Ranger 22, and the catamaran. He also attempted to secretly dispose of the Ranger 22 and acted in concert with Mr. Fortney to move and dispose of the catamaran.

What's more, the court has concluded that Mr. Bliss and Mr. Fortney made false statements in their declarations regarding the ownership of the catamaran. Both Mr. Bliss and Mr. Fortney claimed in their declarations that Mr. Fortney owned the catamaran. However, there is ample evidence that Mr. Bliss purchased the boat for himself. The compelling and strong evidence that contradicts Mr. Bliss's and Mr. Fortney's sworn declarations leaves the court with a firm conviction that the sworn statements are false. Mr. Bliss and Mr. Fortney submitted these false statements to the court in connection with a judicial proceeding, and with the clear intention that the court would rely on them in performing its judicial duties. The court refers the matter to the United States Attorney's office to consider whether to prosecute Mr. Bliss and Mr. Fortney for perjury.

## ORDER

It is ordered that Roger S. Bliss is found in contempt of the court's Asset Freeze Order and Order Appointing Receiver. The court stays civil-contempt sanctions and refers the matter to the United States Attorney's Office for the District of Utah to consider whether to prosecute Mr. Bliss for criminal contempt and whether to prosecute Mr. Bliss and Mr. Fortney for perjury. The court directs the Clerk of Court to deliver to the United States Attorney's Office for the District of Utah a copy of this Order, the relevant filings with their attachments (Dkt. Nos. 57, 69, 70, 73, 77, and 80), and a transcript of the show-cause hearing held on August 7, 2015.

SO ORDERED this 14th day of August, 2015.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge